Christian Chiavetta
11245 S. Nystrom Way
Palmer, Alaska 99645
(907) 726-7585
chris.chiavetta@gmail.com
Plaintiff, Self-Represented

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

CHRISTIAN CHIAVETTA,
Plaintiff,
v.
PATRICIA PITNEY, in her individual capacity; MATTHEW COOPER, in his official capacity as President of the University of Alaska; JEFF EARLE, in his individual capacity; SEAN PARNELL, in his individual capacity; CHERYL SIEMERS, in her individual capacity; JENNIFER BOOZ, in her individual capacity; SARA CHILDRESS, in her individual capacity; BEN STEVENS, in his individual capacity; RYAN WARK, in his individual capacity; and RYAN BUCHHOLDT, in his individual capacity,
Defendants.

RECEIVED
OCT 01 2026
CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

Case No. 3:26-cv-00345-ACP

**COMPLAINT FOR DAMAGES AND PROSPECTIVE RELIEF UNDER 42 U.S.C. § 1983**
**JURY TRIAL DEMANDED**

## I. INTRODUCTION

1. This action concerns two deprivations of constitutionally protected interests during Plaintiff Christian Chiavetta's employment as a sworn police officer with the University of Alaska Anchorage Police Department.

2. The first occurred on October 6, 2024, when the University reduced Plaintiff's rank and compensation based on an investigation whose accusations were attributed only to numbered witnesses, whose underlying interviews and evidence

were never provided to Plaintiff, and which incorporated material evidence gathered after Plaintiff's only interview.

3. The second occurred in July 2025, when the University terminated Plaintiff's employment based on a single finding: that a private prelitigation demand letter Plaintiff sent to a coworker constituted retaliation. The President sustained the termination on September 26, 2025.

4. Defendant Buchholdt, who drafted the termination letter, testified under oath that the Chief of Police had informed him that the same coworker had separately been found to have violated department policy by gossiping about colleagues including Plaintiff, that discipline was pursued for it, and that the conduct was independent of the coworker's participation in the earlier investigation. The investigator who made the retaliation finding, Defendant Wark, interviewed that same Chief of Police, but declined to interview any of the witnesses Plaintiff identified.

5. Wark further testified that he never provided Plaintiff any of the evidence he gathered, and that the University's process does not provide parties access to that evidence.

6. Plaintiff identified four witnesses with firsthand knowledge bearing on his motive, two of whom were physically present when he decided to send the demand letter. Wark interviewed none of them.

7. Wark nevertheless made an affirmative finding as to Plaintiff's motive.

8. Defendant Buchholdt, who drafted the termination letter, testified: "He was terminated for retaliating upon a participant in that first investigation. Had he not retaliated, he would not have been terminated for that action."

9. When the retaliation finding finally reached a forum with sworn testimony and cross-examination, that forum had already been directed to treat the finding as conclusively established.

10. Plaintiff brings this action under 42 U.S.C. § 1983 for deprivation of property without due process of law, and for adverse employment action taken because of his resort to the courts.

## II. JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiff's claims arise under the Constitution and laws of the United States.

12. Plaintiff's claims arise under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments.

13. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

14. This Court may award prospective injunctive relief against a state official in his official capacity under Ex parte Young, 209 U.S. 123 (1908).

15. Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants reside in Alaska and because substantially all events giving rise to Plaintiff's claims occurred in Alaska.

16. Exhaustion of state administrative remedies is not a prerequisite to an action under § 1983. Patsy v. Board of Regents, 457 U.S. 496 (1982).

## III. PARTIES

### A. Plaintiff

17. Plaintiff Christian Chiavetta resides in Palmer, Alaska.

18. Plaintiff began employment with the University of Alaska Anchorage Police Department in January 2020.

19. Plaintiff was promoted to Sergeant in July 2023 and also served as the Department's Training Coordinator.

20. Plaintiff was a regular, non-probationary employee at all times material to this Complaint.

21. Plaintiff was demoted effective October 6, 2024.

22. Plaintiff's employment and pay ended in July 2025, when the Chancellor adopted an administrative law judge's recommended decision upholding his termination. Defendant Pitney sustained the termination in a final decision on September 26, 2025.

### B. Defendants

23. Defendant Patricia Pitney was at all material times President of the University of Alaska.

24. Pitney issued the final University decisions sustaining Plaintiff's demotion findings and his termination.

25. Pitney is sued in her individual capacity only.

26. Defendant Matthew Cooper is the current President of the University of Alaska.

27. Cooper is sued in his official capacity only, solely for prospective relief.

28. Defendant Jeff Earle was at all material times Chief of the University of Alaska Anchorage Police Department.

29. Earle signed and served the October 6, 2024 demotion that reduced Plaintiff's rank and compensation.

30. Earle is sued in his individual capacity only.

31. Defendant Sean Parnell was Chancellor of the University of Alaska Anchorage during material portions of the events alleged.

32. Parnell adopted or affirmed investigative findings that were used as the basis for discipline against Plaintiff.

33. Parnell is sued in his individual capacity only.

34. Defendant Cheryl Siemers succeeded Parnell as Chancellor of the University of Alaska Anchorage, serving as Interim Chancellor from May 2025 and as Chancellor since March 2026.

35. Siemers adopted the recommended decision that terminated Plaintiff's employment.

36. Siemers is sued in her individual capacity only.

37. Defendant Jennifer Booz was the University of Alaska Anchorage Chief Diversity Officer and served as the designated reviewer of the findings of both investigations.

38. Booz reviewed and confirmed those findings while in possession of an evidentiary record materially broader than the record made available to Plaintiff.

39. Booz is sued in her individual capacity only.

40. Defendant Sara Childress was Director of the University's Office of Equity and Compliance.

41. Childress administered material aspects of both investigative processes, received Plaintiff's contemporaneous objections to the withholding of evidence, and did not provide the requested evidence before discipline issued.

42. Childress is sued in her individual capacity only.

43. Defendant Ben Stevens was a civil-rights investigator in the Office of Equity and Compliance.

44. Stevens conducted the first investigation and authored its Final Investigative Report.

45. Stevens is sued in his individual capacity only.

46. Defendant Ryan Wark was a Civil Rights and Title IX Investigator employed by the University of Alaska Anchorage.

47. Wark conducted the retaliation investigation arising from Plaintiff's demand letter and signed the resulting final report.

48. Wark is sued in his individual capacity only.

49. Defendant Ryan Buchholdt was a Vice Chancellor of the University of Alaska Anchorage.

50. Buchholdt participated in Plaintiff's disciplinary process, drafted the termination letter, and testified concerning the reason termination was selected.

51. Buchholdt is sued in his individual capacity only.

52. Each Defendant acted under color of state law at all times material to this Complaint.

53. Each Defendant is sued for that Defendant's own personal conduct as alleged below, and not on any theory of vicarious liability.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff Held a Protected Property Interest in His Employment, Rank, and Compensation

54. University of Alaska Board of Regents' policies and University regulations provide that regular, non-probationary employees may be disciplined or terminated only for cause.

55. Regents' Policy P04.07.060, titled "Termination for Cause," provides that "[r]egular employees may be terminated from employment for cause."

56. The University terminated Plaintiff under that standard. Its final decision framed the question as whether the retaliation finding "was sufficient grounds to warrant the corrective action of termination for cause."

57. Those policies establish substantive limits on the University's discretion to demote or terminate a regular employee.

58. Plaintiff relied on those policies as a condition of his continued employment.

59. The University itself treated Plaintiff as holding due-process rights in his employment.

60. Defendant Buchholdt acknowledged under oath that Plaintiff possessed due-process rights in his employment.

61. The Alaska Superior Court has held that Plaintiff's demotion "is subject to due process protections." Order on Case Motions ##4, 5, 6, 7, 8, and 9 at 5–6, Chiavetta v. University of Alaska, No. 3AN-25-04782 CI (Alaska Super. Ct. Feb. 13, 2026).

62. Plaintiff therefore held a property interest, protected by the Fourteenth Amendment, in his continued employment and in his rank and compensation as a Sergeant.

**B. The First Investigation**

63. On or about April 26, 2024, the Office of Equity and Compliance notified Plaintiff that he was the subject of an investigation designated Maxient No. 20240518.

64. Defendant Stevens was assigned to conduct that investigation.

65. Plaintiff was interviewed one time, on May 7, 2024.

66. The investigation continued after Plaintiff's interview.

67. On May 9, 2024, two days after interviewing Plaintiff and before issuing any findings, Defendant Stevens interviewed Feagin-Walden as a witness.

68. During that interview, Feagin-Walden asked Stevens his "over under on the punishment." Stevens responded: "If he's found responsible, HR will do something," and "[t]his is kind of a big deal. I mean, he's a sergeant in the police department." Stevens added: "I've had cases where people should have been fired and just got a writeup."

69. Stevens therefore knew, while the investigation was open, that his findings would be used to impose discipline on Plaintiff, and he discussed the anticipated severity of that discipline with a witness whose statements he was gathering, before Plaintiff had been shown any of the evidence against him.

70. At least one material witness interview took place in June 2024, after Plaintiff had already given his only response.

71. Plaintiff was not recalled, was not told the substance of the evidence obtained after his interview, and was not given an opportunity to respond to it before findings issued.

72. Stevens issued a Final Investigative Report in June 2024.

73. In that report, material factual accusations against Plaintiff were attributed to witnesses identified only by number.

74. Plaintiff could not determine from the report which person had made which accusation.

75. Plaintiff could not evaluate the relationship of any accusing witness to the events described, that witness's bias or motive, or whether a given witness had firsthand knowledge or was repeating what others had said.

76. Plaintiff was not provided the underlying witness interviews.

77. Plaintiff was not provided the documentary evidence relied upon in the report.

78. Plaintiff repeatedly requested the underlying evidence and the identity of the accusing witnesses so he could provide a meaningful response.

79. Plaintiff offered evidence he contended was exculpatory and identified specific investigative steps capable of testing the disputed allegations. Both were ignored.

80. Plaintiff did not receive the underlying evidence, and was not given a meaningful explanation of it, before the findings were used to discipline him.

81. Plaintiff also requested the advisor resources described in University Regulation 01.02.025.

82. Defendant Childress informed Plaintiff that no list of advisors existed and that Plaintiff could select anyone to support him.

### C. The Formal Review Ignored Plaintiff's Objections and Was Conducted by a Reviewer Whose Training Was Never Identified

83. On June 21, 2024, Plaintiff disputed the findings in writing. He stated: "This investigation itself I find to be illegitimate. I am not allowed to see evidence; I am not allowed to cross exam during questioning."

84. In the same submission, Plaintiff reported that he had requested a copy of the case report and the interviews in order to prepare his request for formal review and had not received them; objected that one allegation rested on a statement taken after his interview; and reported that a witness he had identified, listed in the report as unreachable, had told him no attempt was made to contact her.

85. On June 26, 2024, Defendant Booz was appointed to conduct the formal review. The appointment stated that new evidence generally would not be admitted.

86. University Regulation R01.02.025 requires that a formal review be conducted by trained individuals appointed by the chancellor.

87. Plaintiff asked what training Booz had to conduct the formal review. His question was not answered.

88. On information and belief, Booz had not received training in conducting formal reviews of investigative findings.

89. Booz issued her review on July 1, 2024, three business days after her appointment.

90. The review summarized Plaintiff's submission as raising two grounds: "1. The allegations are untruthful. 2. That the witnesses' relationships to each other make the information invalid."

91. The review did not address Plaintiff's objections that he had been denied the evidence, that he had not been permitted to question witnesses, that his requests for the case report and interviews had been refused, or that an allegation had been added after his interview.

92. The review concluded that "the evidence reviewed and investigative techniques used were appropriate to the situation."

93. On July 12, 2024, Defendant Parnell adopted the findings.

### D. The University's Own Regulation Required Disclosure of Accusers Whenever Discipline Was Contemplated

94. The investigative processes applied to Plaintiff were conducted under University Regulation R01.02.025, which carried a revision date of June 29, 2017 and was unchanged throughout the events alleged in this Complaint.

95. That regulation provides, under the heading "Identity of Complainant," that "[w]henever formal disciplinary action may be contemplated, alleged offenders will be advised of the identity of their accusers, the nature of the charges being brought against them, and the circumstances of the alleged offense(s)."

96. That regulation further provides that the standard of proof in any investigation is a preponderance of the evidence, and that "[w]hen a preponderance of the evidence is found to substantiate a complaint, disciplinary action may be taken."

97. That regulation further provides that a copy of the written findings will be distributed to the complainant, the respondent, the respondent's supervisor, the regional personnel officer, the Office of General Counsel, and the Statewide Office of Human Resources.

98. That regulation further provides that a party disputing the written findings may request a formal review, which is conducted by one or more trained individuals appointed by the chancellor, for the purpose of providing the chancellor "an objective review of the investigation findings when those findings are disputed by one of the involved parties," with the resulting written recommendation forwarded to the chancellor for decision.

99. That regulation further provides that a party dissatisfied with the chancellor's decision may request discretionary review by the president, and that the president's decision is the final decision of the university.

100. The structure of that regulation establishes that a formal investigation under it is a predicate to employment discipline, that its findings are transmitted directly to the officials who impose discipline, and that its outcome proceeds through the chancellor to the president.

101. Every Defendant who participated in that process therefore knew that formal disciplinary action was contemplated and that the findings would be used to determine whether and what discipline would be imposed on Plaintiff.

102. Plaintiff was not advised of the identity of his accusers.

103. Plaintiff was not provided the underlying interviews or evidence at any point before discipline was imposed.

104. The University's own regulation identified the disclosure of accuser identity as the process due once discipline was contemplated, and that disclosure did not occur.

105. The University's governing policies also direct that they not be applied to abridge constitutional rights. Regents' Policy P01.02.010(B) provides: "The university will not limit or abridge any individual's constitutional right to free speech."

106. Regents' Policy P01.02.025(D) provides: "Nothing contained in this policy will be construed or applied to limit or abridge any person's constitutional right to freedom of expression or to infringe upon the legitimate academic freedom or right of due process of any member of the university community."

**E. The Withheld Evidence Was Material Because the Central Accusation Rested on a Single Witness**

107. One of the most damaging accusations considered in the first investigation was that Plaintiff had made a statement implying sexual conduct with a minor.

108. That accusation originated with Trey Feagin-Walden, then a University dispatcher.

109. In sworn deposition testimony taken June 2, 2025, Feagin-Walden characterized the alleged remark not as an admission but as a "crass joke."

110. Feagin-Walden could not identify when the alleged remark was made, except that it occurred during his training period.

111. Asked who else was present, Feagin-Walden testified that he thought his trainer was in the bathroom, and that he did not remember.

112. Feagin-Walden ultimately testified that he believed he was the only person who heard the alleged remark.

113. No other University employee has been identified as having personally heard Plaintiff make the alleged statement.

114. The accusation had circulated within the Department before the investigation began, with employees repeating to one another what they had heard from others.

115. Feagin-Walden acknowledged that he was the source of the accusation.

116. The fact that multiple employees were aware of the accusation therefore did not constitute independent corroboration of it; it reflected the dissemination of a single accusation.

117. Asked in the same deposition to identify other employees with firsthand knowledge of other allegations against Plaintiff, Feagin-Walden acknowledged that he was guessing.

118. Because the accusation depended on the credibility of one witness, the identity of that witness and the content of his interview were material to any meaningful response by Plaintiff.

119. Plaintiff did not have that information when he responded, and did not have it when the findings were used to demote him.

**F. Plaintiff Was Demoted Without a Meaningful Opportunity To Respond**

120. After the findings issued, University officials began determining what discipline to impose.

121. Complainants were consulted regarding the corrective action they wished to see.

122. Plaintiff was not. After the Final Investigative Report issued, no University official asked Plaintiff a single question about anything in it.

123. No official who participated in selecting, approving, or imposing the demotion, including Defendants Booz, Parnell, and Earle, interviewed Plaintiff, asked for his account of any finding, or asked him to respond to any specific accusation before the demotion was imposed.

124. The officials who imposed discipline conducted no independent inquiry into the facts. They relied entirely on the findings of the Office of Equity and Compliance.

125. Plaintiff's only opportunity to address the accusations was his single interview on May 7, 2024, before other witness interviews were conducted and before any finding existed.

126. University officials discussed demotion, additional training, increased oversight, and other measures.

127. Plaintiff was not provided an explanation of the employer's evidence sufficient to cure the deficiencies described above.

128. Plaintiff was not provided a hearing or other proceeding directed to the proposed demotion before it took effect.

129. On October 6, 2024, Defendant Earle signed and served Plaintiff's demotion.

130. Plaintiff lost his rank as Sergeant, the authority associated with that rank, and the compensation associated with that rank.

131. Earle later testified under oath, at the July 7, 2025 administrative hearing, that no pre-demotion hearing occurred.

132. Plaintiff pursued administrative review after the demotion took effect.

133. Plaintiff filed a Step 3 grievance on November 16, 2024. Defendant Buchholdt paused it pending the President's discretionary review.

134. At the Step 3 grievance meeting on February 11, 2025, Buchholdt stated that Plaintiff was not allowed to dispute the findings of the investigation in that meeting.

135. The grievance meeting was therefore confined to the appropriateness of the corrective action. No part of it was an opportunity to respond to the findings on which the demotion rested.

136. Plaintiff requested an evidentiary hearing on the demotion at Step 4 of the University's grievance process. Defendant Parnell denied that request on March 4, 2025, and the denial became the University's final decision on the demotion.

137. Plaintiff therefore received no evidentiary hearing on the demotion either before or after it took effect.

138. Plaintiff did not obtain substantial portions of the underlying evidence until months after the demotion had already reduced his rank and pay.

**G. Months After the First Investigation Closed, Plaintiff Learned of Continuing Conduct Outside It**

139. The first investigation concluded in or about June 2024.

140. In late 2024, Plaintiff received reports that Feagin-Walden was continuing to repeat allegations about Plaintiff to other employees, outside any investigative process.

141. On December 5, 2024, Plaintiff sent Chief Earle a written report of newly reported conduct.

142. That email stated that Plaintiff had learned that day that Feagin-Walden had called him a pedophile during a gossip session in the dispatch room in front of multiple employees.

143. The email further stated that this was the second person Plaintiff understood to have verified Feagin-Walden making that statement in dispatch.

144. Earle acknowledged receiving the December 5, 2024 email.

145. Plaintiff's concern was therefore not limited to what Feagin-Walden had said to investigators months earlier.

146. Plaintiff was reporting continuing dissemination occurring after the investigation had closed.

## H. Plaintiff Notified His Chain of Command Before Seeking Civil Relief

147. Plaintiff advised Chief Earle that he intended to take legal action against Feagin-Walden.

148. Earle knew of Plaintiff's intended legal action before Plaintiff proceeded.

149. Earle testified under oath that Plaintiff "did follow the University Police Department's operating procedures manual" by notifying the Department that he intended to take legal action.

150. Earle further testified that, to his knowledge, Plaintiff was not required to do anything further under those procedures before taking legal action.

151. Earle forwarded Plaintiff's notification to Defendant Buchholdt and to the University Office of General Counsel.

152. Plaintiff did not conceal his intended civil action from his employer.

## I. The Demand Letter and the Civil Action That Followed

153. By letter dated December 12, 2024, Plaintiff sent Feagin-Walden a prelitigation demand.

154. The demand letter asserted that Feagin-Walden had made false and defamatory statements about Plaintiff.

155. The statements identified included allegations relating to sexual conduct with a minor, prostitutes, professional corruption, and other matters affecting Plaintiff's personal and professional reputation.

156. The demand letter referred to statements made in connection with the earlier investigation and also stated that the statements were made falsely and maliciously "as well as other times."

157. The demand letter requested retraction of statements it identified as false.

158. The demand letter requested an apology.

159. The demand letter requested monetary compensation.

160. The demand letter stated that litigation would follow if the matter was not resolved.

161. Plaintiff provided a copy of the demand letter to Chief Earle.

162. Defendant Wark later confirmed that he received a copy of the demand letter from Earle.

163. Plaintiff thereafter filed the civil action the demand letter had contemplated: Chiavetta v. Feagin-Walden, Case No. 3AN-25-04064 CI, Alaska Superior Court, Third Judicial District at Anchorage.

164. That action asserts defamation and remains pending.

165. No court has determined that Plaintiff's civil action is objectively baseless or a sham.

**J. The University Opened a Retaliation Investigation Into the Demand Letter**

166. The Office of Equity and Compliance opened a new matter concerning Plaintiff's demand letter.

167. The matter was assigned to Defendant Wark.

168. Wark was not new to the matter. On May 8, 2024, during the first investigation, Wark attended the investigator's interview of Chief Earle and questioned Earle directly on the substance of the allegations against Plaintiff, including whether any officer had reported to Earle that a use of force was excessive.

169. Wark closed that interview with a question premised on the first investigation's other witness interviews: "We've talked to people who have their side of the story. . . . What do you think is the major catalyst for a lot of the disconnect in the different narratives that we've encountered here?"

170. At the July 7, 2025 administrative hearing, Wark described his role in the first investigation as having sat in three interviews and reviewed body camera footage, and testified that "as far as evidence gathering or speaking with the witnesses or writing a report, I didn't have any involvement."

171. The Maxient case-management access log shows that Wark accessed the file of the first investigation.

172. In the retaliation investigation, Wark again interviewed Chief Earle.

173. Wark was therefore assigned to determine whether Plaintiff's demand letter retaliated against a participant in an investigation in which Wark had himself questioned witnesses.

174. Wark testified that the scope of his investigation was retaliation arising from the December demand letter.

175. The Office of Equity and Compliance issued a notice on January 6, 2025 describing the conduct as prohibited by Chapter 01.04 of the University's

regulations, and issued an amended notice on January 27, 2025 substituting Chapter 01.02 after Plaintiff raised jurisdictional objections to the original charge.

176. The notice characterized Plaintiff as having sought a full retraction of statements made in the earlier investigation.

177. The demand letter itself characterized the statements to be retracted as false statements.

178. Buchholdt acknowledged under oath that the demand letter used the words "false statements."

179. Wark likewise testified that the demand was for retraction of allegedly false statements.

180. Plaintiff objected contemporaneously to the University's characterization of the letter.

### K. Wark Determined Plaintiff's Motive Without Interviewing the Witnesses Plaintiff Identified

181. Wark obtained a recorded interview of Feagin-Walden.

182. Plaintiff provided Wark a detailed written response.

183. Plaintiff requested that his responses be handled in writing rather than by recorded oral interview, and Wark accommodated that request.

184. Plaintiff identified to Wark four witnesses with information bearing directly on why Plaintiff sent the demand letter: Madeline Day, Michael McPherson, Wayne Cook, and Kevin Stevenson.

185. Plaintiff designated Cook and Stevenson as exculpatory witnesses in his witness submission.

186. Cook and Stevenson were present when Plaintiff decided to send the demand letter.

187. Asked at the later administrative hearing whether Plaintiff had requested that he contact Day, McPherson, and Cook, Wark answered: "Right."

188. Asked whether he interviewed any of them, Wark answered: "We did not."

189. Wark did not interview Stevenson either.

190. From the parties' witness lists, Wark interviewed only two people: Feagin-Walden's supervisor, Pete Summers, and Chief Earle.

191. Wark stated that he intentionally did not reinvestigate the first investigation and treated certain proffered witnesses as outside the scope of his inquiry.

192. Nothing in the notice of investigation informed Plaintiff that the inquiry would be confined to the four corners of the demand letter. Plaintiff learned of that limitation, and that his witnesses had been declined under it, only when the findings issued.

193. The factual question Wark decided, however, was why Plaintiff sent the demand letter.

194. Day, McPherson, Cook, and Stevenson possessed firsthand information about the conduct Plaintiff identified as the reason he sought legal relief.

195. At the July 7, 2025 administrative hearing, Cook and Stevenson each testified under oath to the circumstances in which Plaintiff decided to send the demand letter.

196. Because the hearing officer had been directed to treat the retaliation finding as conclusively established, that testimony could not be weighed against it.

197. Wark declined to interview witnesses capable of corroborating Plaintiff's stated non-retaliatory motive while making an affirmative finding as to that motive.

### L. Wark's File Contained Evidence Supporting Plaintiff That Plaintiff Never Received

198. Wark testified that his investigative file included emails with the parties, interview transcripts, communications with Chief Earle, the demand letters, certified-mail materials, and a document notifying Earle of Plaintiff's intention to sue.

199. Asked whether Plaintiff was provided that evidence, Wark testified that under University Regulation 01.02 the process does not include an evidence review and that parties are not provided access to the evidence gathered.

200. Wark further testified: "I have never sent him a copy of the evidence that I've gathered."

201. Plaintiff submitted his defense to the retaliation allegation without access to the evidence in Wark's file.

202. On information and belief, portions of that evidence, including Wark's communications with Chief Earle, corroborated Plaintiff's position.

### M. The University Found and Disciplined Feagin-Walden's Separate Gossip About Plaintiff

203. At the July 7, 2025 administrative hearing, Defendant Buchholdt testified on cross-examination that Chief Earle had informed him of "a conversation related to other gossiping that Mr. Feagin Walden had been doing, and discipline we were going to engage with him on that."

204. Buchholdt testified: "I believe Chief Earle's investigation did find that he was in violation of department policy for gossiping about a number of colleagues."

205. Asked whether the gossip included Plaintiff, Buchholdt answered: "It did include your client, yes."

206. Asked whether that conduct "was independent of his statements that he made in the investigation process," Buchholdt answered: "Correct."

207. Buchholdt placed that conduct in "either the December or January time frame," the same period in which Plaintiff wrote the demand letter and in which Wark conducted the retaliation investigation.

208. Feagin-Walden's repetition of his accusations to friends and family was likewise conduct outside the investigation, and it was among the conduct Plaintiff's demand letter sought to stop.

209. The University therefore identified, investigated, found a policy violation as to, and pursued discipline for conduct by Feagin-Walden that (a) occurred outside his participation in the earlier investigation, (b) concerned Plaintiff, and (c) the University's own Vice Chancellor described as independent of that participation.

210. That determination was directly relevant to Plaintiff's defense that his demand letter responded to Feagin-Walden's later, unprotected conduct.

211. Chief Earle, who conducted the departmental investigation of that conduct, was one of only two people Wark interviewed in the retaliation investigation.

212. Wark's findings do not address the departmental finding that Feagin-Walden had gossiped about Plaintiff independent of the earlier investigation.

213. Plaintiff was not provided Wark's interview of Earle, Wark's communications with Earle, or any record of the departmental finding before Wark issued his findings.

214. Wark issued his final retaliation report on February 10, 2025, finding that Plaintiff's demand letter constituted retaliation.

**N. The University Identified the Private Legal Demand Itself as the Adverse Action**

215. Plaintiff held no supervisory authority over Feagin-Walden at any time material to this Complaint.

216. Wark acknowledged that Plaintiff was not Feagin-Walden's supervisor.

217. Plaintiff had no power to demote Feagin-Walden, to terminate him, to alter his compensation or assignments, or to impose University discipline on him.

218. Asked on cross-examination whether Plaintiff lacked the ability to reprimand or take adverse employment action against Feagin-Walden, Wark did not identify any governmental or employment power held by Plaintiff.

219. Wark instead answered: "In this case, he sent him a letter, so he had the ability."

220. Wark testified elsewhere that the adverse action identified in his report was the threat of potential litigation and the monetary demand accompanying the request for retraction.

221. The act the University designated as retaliatory was therefore Plaintiff's private prelitigation demand and the civil claim it asserted.

**O. Termination**

222. Plaintiff disputed the retaliation finding and requested formal review. Defendant Booz was again appointed as the reviewer, and she confirmed the finding.

223. Plaintiff had been given none of the evidence on which the retaliation finding rested when Booz confirmed it.

224. Defendant Parnell then affirmed the retaliation finding.

225. On March 31, 2025, Plaintiff was directed to attend a meeting with Buchholdt. He was not told its purpose.

226. Before the meeting, Plaintiff asked Buchholdt's assistant what the meeting concerned, and she stated that she did not know.

227. On March 28, 2025, Plaintiff asked Chief Earle what the meeting concerned. Earle stated that he did not know.

228. The only document on the table when Plaintiff arrived was the termination letter Buchholdt had drafted. Plaintiff was handed that letter at the meeting.

229. No evidence, report, or other material concerning the retaliation finding was presented to Plaintiff at the meeting, and he was not asked to respond to anything before the letter was delivered.

230. Plaintiff was on duty and armed at the time. On information and belief, Chief Earle knew in advance that the meeting would deliver notice of termination and

positioned himself nearby for that reason, consistent with the Department's unwritten practice of having an officer present when delivering termination to an employee in circumstances considered to present a risk, including an employee who is on duty and armed.

231. On information and belief, Earle knew the purpose of the meeting when he told Plaintiff, three days earlier, that he did not know.

232. The decision to pursue termination had therefore been made, and the steps to deliver it arranged, before Plaintiff was asked anything about the retaliation finding.

233. Defendant Buchholdt drafted the termination letter.

234. Buchholdt acknowledged at the later administrative hearing that the termination letter did not identify the specific policy provisions allegedly violated.

235. Buchholdt testified: "The retaliation was, indeed, why he was terminated."

236. Buchholdt further testified: "He was terminated for retaliating upon a participant in that first investigation. Had he not retaliated, he would not have been terminated for that action."

237. Buchholdt testified that this was the first retaliation matter of this kind he had personally encountered.

238. Buchholdt acknowledged that lesser corrective measures, including suspension or demotion, were available depending on the facts.

239. After the retaliation report issued, no University official asked Plaintiff a single question about anything in it before the notice of intent to terminate issued.

240. The officials who selected termination conducted no independent inquiry into the facts. They relied entirely on the findings of the Office of Equity and Compliance.

241. The retaliation finding was the operative basis for Plaintiff's termination.

**P. The Administrative Hearing Did Not Adjudicate the Retaliation Finding**

242. Plaintiff requested a hearing before the Alaska Office of Administrative Hearings.

243. The hearing was held July 7 and 8, 2025, before Administrative Law Judge Rebecca Kruse, in OAH No. 25-1011-UNI.

244. Before the hearing, the Administrative Law Judge entered an order giving collateral-estoppel effect to issues determined in the University's internal investigations.

245. At the outset of the hearing, Plaintiff's counsel objected that internal employer investigations are not adjudications and lacked sworn testimony, cross-examination, defined evidentiary rules, and other adjudicatory safeguards.

246. Counsel stated that the administrative hearing represented Plaintiff's opportunity to present evidence and witness testimony before a neutral adjudicator.

247. The Administrative Law Judge noted the objection and ruled that the collateral-estoppel order would stand.

248. The retaliation finding was therefore produced by a non-adjudicatory internal process and then treated as established in the only proceeding that could have supplied a neutral evidentiary hearing on it.

249. Evidence undermining that finding emerged at the hearing itself, including Buchholdt's testimony that the University had found Feagin-Walden in violation of department policy for independent gossip involving Plaintiff, and Wark's admission that he had never provided Plaintiff the evidence he gathered. Up until this point, Plaintiff did not know Feagin-Walden was disciplined for "gossiping" about him.

250. Because the retaliation finding was already treated as established, that evidence could not be used to obtain a first determination of whether Plaintiff's demand letter was in fact motivated by Feagin-Walden's participation in the earlier investigation rather than by his later conduct.

251. On or about July 17, 2025, the Administrative Law Judge issued a recommended decision upholding the termination on the basis of the retaliation finding.

252. On or about July 18, 2025, Defendant Siemers adopted the recommended decision. Plaintiff's employment and pay ended at that time.

253. Siemers adopted the recommended decision although it did not determine, and on its face declined to determine, whether the retaliation finding on which it rested was correct.

254. Plaintiff sought discretionary review by the President. On September 26, 2025, Defendant Pitney sustained the termination in the University's final decision.

255. Pitney's decision described the recommended decision as having "limited its scope to a determination of whether or not the prior finding of retaliation, which itself was not subject to further review under this process due to collateral estoppel, was sufficient grounds to warrant the corrective action of termination for cause."

256. Pitney's decision further stated that her review "is not a de novo review," and that she was "not, in connection with this review, re-investigating the facts of the matter or the determinations of law." No evidentiary proceeding on the retaliation finding occurred at that stage either.

257. Plaintiff lost his salary, employer-paid benefits, retirement contributions, rank, and career.

**Q. Facts Bearing on the Public Significance of the Underlying Dispute**

258. Plaintiff was a sworn police officer vested with state law-enforcement authority.

259. Plaintiff also served as the Department's Training Coordinator, a role bearing on the Department's training and supervision functions.

260. The statements Plaintiff sought to have retracted alleged that a sworn police officer had engaged in sexual conduct with a minor, had solicited prostitutes, and was professionally corrupt and dishonest.

261. Allegations of that kind bear directly on the integrity, credibility, and fitness of a person exercising police authority.

262. A police officer's credibility is subject to disclosure obligations in criminal prosecutions, and accusations of dishonesty affect that officer's ability to serve as a witness.

263. The statements were allegedly circulated within a public police department among other public employees.

264. Feagin-Walden has further stated that he told friends and family what he had said in the investigation.

265. The University itself treated Feagin-Walden's later dissemination as sufficiently disruptive to the workplace to constitute a department-policy violation warranting corrective action.

266. Plaintiff sought relief through the civil courts rather than by invoking any authority conferred on him by his public office.

267. Plaintiff issued no departmental order, initiated no internal discipline, and altered no term or condition of Feagin-Walden's employment.

268. The demand letter and civil action were remedies available to Plaintiff on identical terms whether or not he was employed by the University.

**R. The Findings Remain in Effect and Continue To Injure Plaintiff**

269. The demotion findings and the retaliation finding remain in Plaintiff's University personnel and disciplinary records.

270. A finding that a police officer retaliated against a participant in a civil-rights investigation is a charge of dishonesty and moral turpitude within the law-enforcement profession.

271. The University reported Plaintiff's separation and its stated basis to the Alaska Police Standards Council.

272. The Alaska Police Standards Council has opened a matter concerning Plaintiff's certification and has subpoenaed Plaintiff's University employment record, which contains the demotion findings and the retaliation finding.

273. Plaintiff has been unable to obtain comparable law-enforcement employment.

274. The University did not provide Plaintiff a hearing directed to the truth or falsity of the stigmatizing charge before or after publishing it, because the only hearing provided treated the charge as already established.

## V. ALLEGATIONS CONCERNING PRIOR PROCEEDINGS

275. Plaintiff has two administrative appeals pending in Alaska Superior Court, Third Judicial District at Anchorage: Case Nos. 3AN-25-04782 CI and 3AN-25-09657 CI, which have been consolidated.

276. No final judgment has entered in the consolidated appeals.

277. Those appeals seek review, on the administrative record, of the University's decisions under Alaska appellate standards.

278. Plaintiff initiated those proceedings; they are not enforcement proceedings brought by the State against Plaintiff.

279. Plaintiff does not ask this Court to review, set aside, or enjoin any order entered in those proceedings.

280. Plaintiff's injuries in this action were caused by Defendants' conduct, not by any state-court judgment.

281. The University's internal investigative processes were not adjudicatory.

282. In those processes, testimony was not taken under oath.

283. There was no cross-examination of witnesses.

284. There were no defined rules of evidence.

285. There was no neutral adjudicator separate from the office conducting the investigation.

286. The parties were not provided access to the evidence gathered, as Defendant Wark testified.

287. Plaintiff was not permitted to confront or question the witnesses whose statements were used against him.

288. Plaintiff therefore did not have an adequate opportunity to litigate the factual issues determined in those processes.

289. The administrative hearing before the Office of Administrative Hearings did not supply that opportunity as to the retaliation finding, because the finding was given preclusive effect before the hearing began.

290. No court or tribunal has yet adjudicated, on a record permitting sworn testimony and cross-examination, whether Plaintiff's demand letter was motivated by Feagin-Walden's participation in the earlier investigation.

291. No court or tribunal has yet adjudicated whether the process afforded Plaintiff before his October 6, 2024 demotion satisfied the Fourteenth Amendment.

292. No court or tribunal has yet adjudicated whether the University may impose employment discipline because a public employee resorted to the civil courts.

## VI. CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Property Without Due Process — Demotion
### 42 U.S.C. § 1983 (Fourteenth Amendment)
### Against Defendants Stevens, Childress, Booz, Parnell, and Earle in their individual capacities

293. Plaintiff realleges and incorporates paragraphs 1 through 292.

294. Plaintiff held a property interest protected by the Fourteenth Amendment in his continued employment, rank, and compensation.

295. Before depriving a public employee of a protected property interest, the Fourteenth Amendment requires notice of the charges, an explanation of the employer's evidence, and a meaningful opportunity to respond. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985); Board of Regents v. Roth, 408 U.S. 564 (1972).

296. The opportunity to respond must be meaningful in fact, not merely offered in form.

297. Plaintiff does not allege that due process entitled him to discovery or to a full evidentiary trial before the demotion. He alleges that what the University provided did not amount to the explanation of the employer's evidence that due process requires, and that without such an explanation he had no meaningful opportunity to respond.

298. Plaintiff's opportunity to respond was not meaningful because the accusations against him were attributed only to numbered witnesses, and he could not identify who had accused him of what.

299. Plaintiff was never told the substance of what any identified witness had said about him, and the University provided no other account of the evidence supporting the findings.

300. Material evidence was gathered after Plaintiff's only interview. He was never recalled, and that evidence was never described to him for response before the findings issued.

301. After the findings issued, the officials who imposed the demotion asked Plaintiff nothing about them; the grievance meeting barred him from disputing them; and his request for an evidentiary hearing was denied.

302. Plaintiff could not evaluate the credibility, bias, firsthand knowledge, or internal inconsistencies of the witnesses whose statements were used to demote him.

303. Plaintiff raised these deficiencies before the deprivation occurred, and each Defendant named in this Count was aware of them.

304. Each Defendant named in this Count knew, from the structure of University Regulation R01.02.025 and from the ordinary operation of the process each administered, that formal disciplinary action against Plaintiff was contemplated and that the investigative findings would be used to impose it.

305. Each Defendant named in this Count knew that Plaintiff had not been advised of the identity of his accusers and had not been provided the underlying interviews or evidence.

306. Each Defendant named in this Count therefore knew, or in the alternative recklessly disregarded, that the findings would be used to deprive Plaintiff of rank

and compensation without the disclosure the University's own regulation required and without a meaningful opportunity to respond.

307. By conducting, administering, reviewing, adopting, and implementing the process in that condition, each Defendant named in this Count set in motion a series of acts that each knew or reasonably should have known would cause the deprivation of Plaintiff's protected property interest without constitutionally adequate process.

308. Defendant Stevens conducted the investigation and authored findings while withholding the underlying evidence and while attributing accusations only to numbered witnesses.

309. Defendant Childress administered the process, received Plaintiff's objections to the withholding of evidence, and permitted the process to proceed to discipline without curing the deficiencies.

310. Defendant Booz reviewed and confirmed the findings while in possession of an evidentiary record materially broader than the record made available to Plaintiff.

311. Booz confirmed the findings without addressing Plaintiff's written objections that he had been denied the evidence and the opportunity to question witnesses, although those objections went directly to whether the investigation was adequate.

312. Booz conducted the review without the training the regulation required, or, in the alternative, with training the University declined to identify when Plaintiff asked.

313. Booz's assigned function under University Regulation R01.02.025 was to conduct an objective review of the disputed findings and to forward a written

recommendation for decision; that function required her to evaluate findings whose evidentiary basis had not been disclosed to the party disputing them.

314. Defendant Parnell adopted the findings on July 12, 2024, following Booz's formal review, and thereby set in motion their use as the basis for discipline.

315. Defendant Parnell later denied Plaintiff's request for an evidentiary hearing on the demotion on March 4, 2025, foreclosing the only post-deprivation evidentiary proceeding available to him.

316. Defendant Earle signed and served the demotion, personally effecting the deprivation, with knowledge that Plaintiff had not received the underlying evidence and had not been given a hearing on the proposed demotion.

317. No pre-deprivation hearing directed to the proposed demotion was provided.

318. Access to the evidence months after the demotion could not supply the pre-deprivation opportunity to respond that the Fourteenth Amendment requires.

319. The pre-deprivation opportunity to respond exists to provide "an initial check against mistaken decisions." Loudermill, 470 U.S. at 545. That check cannot operate where the officials imposing discipline never ask the employee about the findings on which they rely.

320. Defendants Booz, Parnell, and Earle adopted and acted on the investigative findings without asking Plaintiff a single question about them, and relied entirely on an investigation whose evidence Plaintiff had never seen.

321. The right of a public employee holding a for-cause property interest to notice, an explanation of the employer's evidence, and a meaningful opportunity to respond before deprivation was clearly established at all times material to this Complaint.

322. Each Defendant named in this Count personally participated in, directed, or set in motion the deprivation.

323. As a direct and proximate result, Plaintiff lost rank, authority, and compensation, and suffered the further injuries alleged below.

**COUNT II**
**Deprivation of Property Without Due Process — Termination**
**42 U.S.C. § 1983 (Fourteenth Amendment)**
**Against Defendants Wark, Booz, Buchholdt, Parnell, Siemers, and Pitney in their individual capacities**

324. Plaintiff realleges and incorporates paragraphs 1 through 323.

325. Plaintiff held a property interest protected by the Fourteenth Amendment in his continued employment.

326. The sole operative basis for Plaintiff's termination was the finding that his demand letter constituted retaliation.

327. That finding was produced through a process in which no testimony was taken under oath, no witness was cross-examined, no rules of evidence applied, no neutral adjudicator presided, and the parties were not given access to the evidence gathered.

328. Defendant Wark made that finding after interviewing Chief Earle, the official who had investigated and found that Feagin-Walden violated department policy by

gossiping about Plaintiff, independent of the earlier investigation, in the same December 2024 to January 2025 period.

329. That determination directly supported Plaintiff's defense.

330. Wark did not disclose his interview of Earle, or any other evidence he gathered, to Plaintiff before issuing his findings.

331. Wark testified that he never provided Plaintiff any of the evidence he gathered.

332. Wark also declined to interview the four witnesses Plaintiff identified as possessing firsthand knowledge bearing on his motive, including the two who were present when Plaintiff decided to send the demand letter.

333. Wark nevertheless made an affirmative determination as to Plaintiff's motive.

334. Wark was not independent of the investigation whose participants his finding protected: he had questioned witnesses in that investigation, including Chief Earle, whom he interviewed again in the retaliation matter, and he accessed that investigation's file, as the Maxient access log reflects.

335. Wark knew that his findings were being made in a disciplinary investigation, that a finding of retaliation could result in separation for cause under University Regulation R01.02.025, and that his written findings would be transmitted to Plaintiff's supervisor, the regional personnel officer, the Office of General Counsel, and the Statewide Office of Human Resources.

336. Wark knew that Plaintiff had not been advised of the identity of the persons whose statements he gathered and had not been provided any of the evidence in his file.

337. Wark therefore knew, or in the alternative recklessly disregarded, that his findings would be used to terminate Plaintiff's employment without Plaintiff having had access to the evidence on which the findings rested.

338. Defendants Booz, Parnell, Buchholdt, Siemers, and Pitney each knew that the retaliation finding had been produced by an investigative process that did not provide the respondent access to the evidence gathered, and each knew that the finding was the operative basis for terminating Plaintiff.

339. Each Defendant named in this Count set in motion, or personally carried out, a series of acts that each knew or reasonably should have known would cause the deprivation of Plaintiff's protected property interest without constitutionally adequate process.

340. Defendant Booz confirmed the retaliation finding in formal review, although Plaintiff had been given none of the evidence on which it rested.

341. Defendant Parnell affirmed or adopted the resulting finding.

342. Defendant Buchholdt relied on that finding in drafting the termination letter and advancing termination, and testified that absent the conduct characterized as retaliation Plaintiff would not have been terminated.

343. Buchholdt knew, from Chief Earle, that Feagin-Walden had been found in violation of department policy for gossiping about Plaintiff independent of the earlier investigation, and nevertheless drafted and advanced Plaintiff's termination on the basis that Plaintiff's letter was retaliation for that investigation.

344. The administrative hearing that followed was directed to treat the retaliation finding as conclusively established.

345. Plaintiff therefore never received a proceeding, at any stage, in which the central factual predicate for his termination was open to determination on sworn testimony subject to cross-examination.

346. Defendant Siemers terminated Plaintiff's employment by adopting a recommended decision that treated the retaliation finding as conclusively established rather than determining it.

347. Defendant Pitney issued the final termination decision without curing that defect and without conducting any evidentiary proceeding on the retaliation finding.

348. Neither Buchholdt nor Parnell asked Plaintiff a single question about the retaliation report before relying on it, and Pitney's review by its own terms did not re-investigate the facts or consider new evidence. Each relied entirely on the findings of the Office of Equity and Compliance.

349. Buchholdt delivered the notice of intent to terminate at a meeting whose purpose was withheld from Plaintiff in advance, after the decision to pursue termination had already been made.

350. A pretermination proceeding that treats the dispositive factual question as already answered, and that rests on a prior process in which the employee was denied the employer's evidence, is not a meaningful opportunity to respond.

351. The right of a public employee to a meaningful opportunity to contest the factual basis for his termination, including an explanation of the employer's evidence, was clearly established at all times material to this Complaint.

352. Each Defendant named in this Count personally participated in, directed, or set in motion the deprivation.

353. As a direct and proximate result, Plaintiff lost his employment and suffered the injuries alleged below.

**COUNT III**
**Deprivation of Liberty Without Due Process — Stigmatizing Charge Without a Name-Clearing Hearing**
**42 U.S.C. § 1983 (Fourteenth Amendment)**
**Against Defendants Wark, Buchholdt, and Pitney in their individual capacities**

354. Plaintiff realleges and incorporates paragraphs 1 through 353.

355. The Fourteenth Amendment protects a public employee's liberty interest in his good name, reputation, honor, and integrity where a stigmatizing charge is publicly made in connection with termination.

356. The University charged that Plaintiff retaliated against a participant in a civil-rights investigation.

357. Within the law-enforcement profession, that charge imputes dishonesty and moral turpitude and forecloses opportunities for continued employment as a police officer.

358. The charge is false.

359. The charge and the stated basis for Plaintiff's separation were published outside the University when the University reported Plaintiff's separation to the Alaska

Police Standards Council, the state body that certifies police officers, and when the University's records containing the charge were produced to that body.

360. The charge was made in connection with, and was the operative basis for, Plaintiff's termination.

361. Plaintiff was not provided a hearing at which the truth or falsity of the charge could be determined, because the only hearing provided treated the charge as conclusively established before it began.

362. Plaintiff requested, and continues to request, an opportunity to clear his name.

363. Defendants Wark, Buchholdt, and Pitney each personally participated in creating, adopting, or publishing the stigmatizing charge without affording Plaintiff a name-clearing hearing.

364. As a direct and proximate result, Plaintiff has been foreclosed from law-enforcement employment and has suffered the injuries alleged below.

**COUNT IV**
**Retaliation for Protected Petitioning**
**42 U.S.C. § 1983 (First Amendment — Petition Clause)**
**Against Defendants Wark, Booz, Buchholdt, Parnell, Siemers, and Pitney in their individual capacities**

365. Plaintiff realleges and incorporates paragraphs 1 through 364.

366. The First Amendment protects the right to petition the government for redress of grievances, which includes genuine resort to the courts.

367. Petition Clause protection extends to prelitigation communications made in contemplation of litigation. Sosa v. DIRECTV, Inc., 437 F.3d 923 (9th Cir. 2006); B&G Foods North America, Inc. v. Embry, 29 F.4th 527 (9th Cir. 2022).

368. Plaintiff's demand letter asserted a concrete civil claim, sought resolution before suit, requested retraction of statements identified as false, sought an apology and monetary relief, and stated that litigation would follow absent resolution.

369. Plaintiff then filed the contemplated lawsuit.

370. The demand letter and the lawsuit were a continuous course of resort to the courts.

371. Plaintiff engaged in that conduct as a private citizen and not pursuant to any official duty.

372. Sending the demand letter and filing the civil action were not among Plaintiff's job duties, were not tasks the University employed him to perform, and were not requested, assigned, or authorized by the University as part of his work.

373. Plaintiff's employment conferred no right, capacity, or access that enabled him to send the demand letter or file the civil action. Any private citizen who believed himself defamed by Feagin-Walden could have pursued the identical remedies, in the identical forum, on identical terms.

374. That Plaintiff learned of Feagin-Walden's statements through the workplace does not convert his petition into an exercise of official duty. The remedy he sought was one available to him solely as a private individual.

375. The University's own witnesses acknowledged that the civil remedy was Plaintiff's as a private citizen. Defendant Buchholdt testified that Plaintiff "has the ability to bring whatever private case he has outside of the University on another individual." Defendant Wark agreed that Plaintiff has a constitutional right to bring defamation claims in a court of law.

376. The University did not contend that Plaintiff was terminated for filing the civil action. It terminated him for the prelitigation demand that announced it.

377. Plaintiff exercised no supervisory, disciplinary, or police authority over Feagin-Walden, and possessed none.

378. Because Plaintiff is a public employee, his petition is protected against employer retaliation where it addresses a matter of public concern, as determined by its content, form, and context. Borough of Duryea v. Guarnieri, 564 U.S. 379 (2011); Connick v. Myers, 461 U.S. 138, 147–48 (1983).

379. Plaintiff's petition was not a workplace grievance. It sought no change in Plaintiff's pay, rank, assignment, or other conditions of employment, sought no relief from the University, and challenged no University decision.

380. Plaintiff's petition addressed a matter of public concern because it concerned allegations that a sworn police officer had engaged in sexual conduct with a minor, solicited prostitutes, and was professionally corrupt and dishonest, circulated within a public law-enforcement agency, bearing on that officer's integrity, credibility as a witness, and fitness to exercise police authority.

381. The accusations Plaintiff sought to have retracted charged a sworn officer with conduct that would constitute crimes. The public has a direct interest in whether officers exercising police authority on its behalf are accused of crimes, and in whether those accusations are true.

382. In form, Plaintiff's petition culminated in a civil action in the public courts of the State of Alaska.

383. The University's own treatment of the underlying dissemination as a department-policy violation warranting discipline confirms that the conduct affected the operation of a public agency and was not confined to a private disagreement.

384. Defendants took adverse action against Plaintiff because of that petitioning activity.

385. Defendant Wark identified the demand letter itself — the threat of litigation and the accompanying monetary demand — as the adverse action constituting retaliation.

386. Asked what power Plaintiff held over Feagin-Walden, Wark identified only Plaintiff's act of sending the letter.

387. Defendant Booz confirmed the finding in formal review.

388. Defendant Parnell affirmed or adopted the resulting finding.

389. Defendant Buchholdt relied on the finding in drafting and advancing the termination.

390. Buchholdt testified that absent the conduct characterized as retaliation, Plaintiff would not have been terminated.

391. Defendant Siemers terminated Plaintiff's employment on the basis of the finding.

392. Defendant Pitney sustained the termination.

393. The adverse action would deter a person of ordinary firmness from resorting to the courts to seek redress.

394. The University's interest in the efficient operation of its police department does not outweigh Plaintiff's and the public's interest in his petitioning, because Plaintiff invoked no governmental authority, notified his chain of command in advance in compliance with department procedure, and was told by his Chief that nothing further was required of him.

395. Defendants had no adequate justification for treating a private civil claim, standing alone, as terminable misconduct.

396. At all times material to this Complaint, it was clearly established that a public employer may not discharge an employee for filing, or announcing an intent to file, a non-sham lawsuit on a matter of public concern where the employer's interest in workplace efficiency does not outweigh the employee's interest in petitioning. Borough of Duryea v. Guarnieri, 564 U.S. 379 (2011); Pickering v. Board of Education, 391 U.S. 563 (1968).

397. No Defendant conducted that weighing before the termination was imposed or sustained.

398. Each Defendant named in this Count personally participated in, directed, or set in motion the adverse action.

399. As a direct and proximate result, Plaintiff lost his employment and suffered the injuries alleged below.

**COUNT V**
**Prospective Injunctive and Declaratory Relief**
**42 U.S.C. § 1983 — Ex parte Young**
**Against Defendant Cooper in his official capacity only**

400. Plaintiff realleges and incorporates paragraphs 1 through 399.

401. Plaintiff remains separated from University employment as a continuing consequence of the decisions challenged in this Complaint.

402. The demotion findings and the retaliation finding remain in effect and remain in University records.

403. Those findings continue to affect Plaintiff's professional standing, his law-enforcement certification, and his ability to obtain employment.

404. Defendant Cooper, as President of the University of Alaska, has authority over University personnel decisions and University personnel records, and has a sufficient connection to the enforcement and continuing effect of the challenged actions.

405. Plaintiff seeks prospective relief to end the ongoing effects of the constitutional violations alleged, including reinstatement, correction or expungement of the findings resulting from constitutionally deficient proceedings, and corrective notification to any certification authority or employer to which those findings were transmitted.

406. Plaintiff seeks no retrospective monetary relief from the State treasury in this Count.

## VII. DAMAGES

407. Plaintiff realleges and incorporates paragraphs 1 through 406.

408. The October 6, 2024 demotion reduced Plaintiff's rank and compensation.

409. The July 2025 termination caused the loss of Plaintiff's salary, employer-paid benefits, retirement contributions, and other compensation.

410. Plaintiff has lost future earning capacity and professional opportunities in law enforcement.

411. Plaintiff has suffered injury to his professional reputation.

412. Plaintiff has suffered emotional distress as a result of the constitutional violations alleged and the resulting loss of his career.

413. Plaintiff seeks compensatory damages against each individual Defendant to the extent that Defendant's own conduct caused or set in motion the injury.

414. Plaintiff seeks nominal damages for any constitutional violation for which actual damages are not established.

415. Plaintiff seeks punitive damages against the individual Defendants to the extent the evidence establishes malicious intent or reckless or callous indifference to Plaintiff's federally protected rights.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the individual Defendants deprived Plaintiff of rights secured by the First and Fourteenth Amendments as alleged in this Complaint;

B. Award compensatory damages against each individual Defendant whose conduct caused Plaintiff's injuries, in an amount to be proven at trial;

C. Award the compensation differential caused by the October 6, 2024 demotion;

D. Award back pay and the value of lost employment benefits and retirement contributions caused by the termination;

E. Award damages for injury to professional reputation and for emotional distress in an amount to be proven at trial;

F. Award nominal damages for any established constitutional violation for which actual damages are not proven;

G. Award punitive damages against the individual Defendants where the evidence supports them;

H. Order, against Defendant Cooper in his official capacity, prospective relief including reinstatement to the position of Sergeant and correction or expungement of the disciplinary findings produced by the proceedings challenged here;

I. Order, against Defendant Cooper in his official capacity, corrective notification to any law-enforcement certification authority or employer to which those findings were transmitted;

J. Order such other prospective equitable relief as is necessary to end the continuing effects of the violations alleged;

K. Award Plaintiff his taxable costs;

L. Award attorney's fees under 42 U.S.C. § 1988 to the extent Plaintiff becomes represented by counsel and such fees are recoverable; and

M. Grant such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

416. Plaintiff demands a trial by jury on all claims and issues so triable.

DATED this 1st day of October, 2026, at Palmer, Alaska.

CHRISTIAN CHIAVETTA
Plaintiff, Self-Represented
11245 S. Nystrom Way
Palmer, Alaska 99645
(907) 726-7585
chris.chiavetta@gmail.com